**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-2467**

_____

CRESCOM BANK, successor by merger to Community FirstBank,

        Plaintiff – Appellee,

    v.

EDWARD L. TERRY,

        Defendant – Appellant,

    and

HARRIS STREET LLC, now known as CCT Reserve LLC; SUGARLOAF
MARKETPLACE LLC; CCT RESERVE LLC,

        Defendants.

_____

**No. 13-2549**

_____

CRESCOM BANK, successor by merger to Community FirstBank,

        Plaintiff – Appellant,

    v.

EDWARD L. TERRY,

        Defendant – Appellee,

    and

HARRIS STREET LLC, now known as CCT Reserve LLC; SUGARLOAF
MARKETPLACE LLC; CCT RESERVE LLC,

        Defendants.

Appeals from the United States District Court for the District of South Carolina, at Charleston. Patrick Michael Duffy, Senior District Judge. (2:12-cv-00063-PMD)

Argued: January 27, 2015                    Decided: May 21, 2015

Before MOTZ and DIAZ, Circuit Judges, and DAVIS, Senior Circuit Judge.

Affirmed in part, vacated in part, reversed in part, and remanded by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Motz and Senior Judge Davis joined.

**ARGUED**: Daniel Francis Blanchard, III, ROSEN, ROSEN & HAGOOD, LLC, Charleston, South Carolina, for Appellant/Cross-Appellee. Meredith Long Coker, ALTMAN & COKER, LLC, Charleston, South Carolina, for Appellee/Cross-Appellant. **ON BRIEF**: Richard S. Rosen, ROSEN, ROSEN & HAGOOD, LLC, Charleston, South Carolina, for Appellant/Cross-Appellee. Charles S. Altman, ALTMAN & COKER, LLC, Charleston, South Carolina, for Appellee/Cross-Appellant.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

CresCom Bank brought suit in the district court to enforce four promissory notes against borrower CCT Reserve, LLC, and to enforce guaranty agreements executed by CCT Reserve's sole member, Edward L. Terry. After CresCom's claims against CCT were resolved in CCT's bankruptcy proceedings, CresCom and Terry each moved for summary judgment on the guaranty agreements. The district court substantially granted CresCom's motion, finding Terry liable under the agreements and awarding CresCom damages of $2,171,211.04. However, the district court denied CresCom's motion with respect to attorney's fees, agreeing with Terry that CresCom could not recover those fees because it did not give adequate notice of its intent to seek them under Georgia law.

Terry appeals the district court's ruling on liability and its calculation of damages, and CresCom has cross-appealed on the issue of attorney's fees. For the reasons that follow, we substantially affirm the district court's grant of summary judgment to CresCom but vacate its award of late fees on the full outstanding principal and reverse its denial of the attorney's fees CresCom incurred in CCT's bankruptcy.

I.

Although the basic facts of this case are not in dispute, we view them in the light most favorable to Terry as the non-

prevailing party below, and resolve any factual ambiguities in his favor.  White v. BFI Waste Servs., LLC, 375 F.3d 288, 294 (4th Cir. 2004).  Terry, a citizen of Florida, is a developer who maintains his office in Georgia and has undertaken real estate projects throughout the Southeast.  Between February and October 2006, CresCom[1] made three loans to Terry's wholly owned corporation, CCT Reserve, LLC,[2] for real estate developments in South Carolina.  The financing was extended in exchange for promissory notes and mortgages in favor of CresCom on the properties being developed.

On February 1, CresCom loaned CCT $1,275,000 for a development called the "Maybank Tract," and CCT delivered Note No. 145002622 ("Note 2622") to CresCom.  On April 12, CresCom loaned CCT $841,260 for another development called the "Baker Tract," and CCT delivered Note No. 145002718 ("Note 2718") to CresCom.  Finally, on October 25, CresCom loaned CCT an additional $881,250 for a development called the "Parker Tract,"

---

[1] CresCom was at the time doing business as Community FirstBank.  In 2011, Community FirstBank merged with Crescent Bank to create CresCom Bank, a South Carolina entity with twelve locations in the state.

[2] At the time the loans were extended in 2006, Terry's wholly owned corporations were known as Harris Street LLC and Sugarloaf Marketplace LLC.  In 2011, Harris Street and Sugarloaf Marketplace merged into CCT, with CCT as the surviving entity.  We refer to Terry's businesses collectively as CCT.

and CCT delivered Note No. 145002911 ("Note 2911") to CresCom. All three loans were "interest only," meaning that CCT was only required to pay the monthly interest on the loans until they reached maturity.

In addition to executing the notes and mortgages on behalf of CCT, Terry also guaranteed all three loans in his personal capacity. He signed the notes, loan agreements, mortgages, and guaranty agreements at his office in Georgia and mailed them to CresCom's office in South Carolina.

After CCT renewed the loans several times, the final maturity date for all three notes was July 25, 2009. In early 2009, with maturity approaching, CCT began having difficulty making its monthly interest payments. To avoid default, the parties executed a Commitment Letter in June 2009 under which CresCom agreed to loan CCT an additional $750,000 to help CCT pay the interest on the earlier loans, as well as property taxes and other expenses related to the real estate securing the loans. In exchange, the Commitment Letter required that the earlier loans be amended to include cross-collateralization and cross-default provisions, providing that in the event of CCT's default on any of the notes, CresCom "at its option and [with] ten (10) days written notice may declare all of the loans in default." J.A. 265–70, ¶ 9. The Commitment Letter was to survive the closing of the new $750,000 loan and become binding

together with the other loan documents.  Id. ¶ 26.  Terry signed the Letter as CCT's representative and in his personal capacity as guarantor.

On June 25, 2009, pursuant to the Commitment Letter, CresCom loaned CCT $750,000 and CCT delivered to CresCom Note No. 145003572 ("Note 3572"), with a maturity date of June 18, 2011.[3]  As with the earlier loans, Note 3572 was secured by a mortgage in favor of CresCom on CCT's real estate in South Carolina and was also personally guaranteed by Terry.

The parties memorialized their new agreement in a written contract titled "Amendment to Loan Agreements and Mortgages to Provide for Cross-Default" (the "Loan Amendment").  The Loan Amendment provided that if CresCom "determines to exercise its rights [under the cross-default provision] it shall give Borrowers no less than ten (10) days written notice from the date of the receipt of the notice to cure default," and specified that notice be given by certified mail or another method that provides proof of delivery.  J.A. 310–12.  The Loan

---

[3]  The parties also signed a written addendum to the Commitment Letter stating that the maturity dates for the first three loans would be extended to coincide with Note 3572's maturity date of June 18, 2011, and reinforcing the cross-default and cross-collateralization provisions.  On August 19, 2009, the parties formally executed loan modification agreements to that effect.

6

Amendment was signed by Terry only in his capacity as CCT's representative, and not in his personal capacity.

Four days before the loans were scheduled to mature, on June 14, 2011, CresCom sent letters to CCT and its predecessors to inform them that full payment would be due on the notes on June 18, 2011, and that there would be no further forbearance or other arrangements. The letters were sent by regular and certified mail to a number of addresses CresCom had on file for the Borrowers, although none were the Marietta, Georgia address specified in the Loan Amendment. Neither CCT nor Terry paid the debt and on June 18, 2011, the principal of all four loans remained outstanding.

After CCT and Terry failed to pay the debt, CresCom filed a complaint in the district court seeking to enforce the four notes against CCT and the guaranty agreements against Terry. Terry answered and filed a motion to dismiss, which the district court denied.

While this action was pending, CCT filed a Chapter 11 Petition in the U.S. Bankruptcy Court for the Northern District of Georgia. CresCom participated in CCT's bankruptcy proceedings as a creditor and the bankruptcy court ultimately ordered that the properties securing CCT's loans be deeded directly to CresCom. After an evidentiary hearing, the bankruptcy court issued an order establishing the value of those

properties and crediting that value, $2,551,000, against the principal owed on the loans. CCT conveyed the properties to CresCom and at the conclusion of the proceedings, the bankruptcy court found that the remaining value of CresCom's unsecured claim against CCT was $1,121,029, based on the amount of principal remaining outstanding. CresCom did not appeal the bankruptcy court's rulings.

Following a period of discovery, CresCom and Terry filed cross-motions for summary judgment in the case at bar. CresCom argued that Terry breached the guaranty agreements by failing to pay the outstanding balance on the notes after CCT defaulted, and sought a judgment of $2,142,861.25 in principal, interest, and late fees, plus attorney's fees and continuing per diem interest against Terry. In Terry's motion for summary judgment, he claimed that (1) his obligations under the guaranty agreements were discharged because CresCom failed to give written notice of default and an opportunity to cure the default as required by the parties' contracts, (2) CresCom could not collect attorney's fees because it failed to give notice and an opportunity to cure as required under Georgia law, and that in any event, (3) his liability was capped at $1,121,029 as a result of the bankruptcy court's order.

The district court granted CresCom's motion for summary judgment on liability, finding that the guaranty agreements were

8

valid and enforceable against Terry. It also held that the bankruptcy court's determination of the value of CresCom's claim in CCT's bankruptcy did not discharge Terry's independent obligation to guarantee the full amount of CresCom's debt.

However, the district court denied CresCom's motion and granted Terry's motion on the issue of attorney's fees. The court found that because Georgia law governs the guaranty agreements, CresCom's failure to provide notice of its intent to seek attorney's fees as required under Ga. Code Ann. § 13-1-11(a)(3) bars it from collecting any attorney's fees from Terry.

After ordering supplemental briefing on damages, the district court awarded CresCom $2,171,211.04 in principal, interest, and fees (after subtracting the value of the conveyed properties). This appeal followed.

II.

Terry raises a number of arguments on appeal that can be distilled into two primary issues: first, whether the district court erroneously granted summary judgment to CresCom on the issue of Terry's liability under the guaranty agreements; and second, whether the district court erred in its calculation of damages. Additionally, we consider CresCom's contention that the district court erred by applying Georgia law to the guaranty

9

agreements and thus refusing to award any attorney's fees incurred by CresCom.

We review the district court's award of summary judgment de novo, applying the same legal standards as the district court did. Motor Club of Am. Ins. Co. v. Hanifi, 145 F.3d 170, 174 (4th Cir. 1998). Summary judgment is appropriate only if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Neither party argues that there are material facts in dispute in this case, and we therefore review each of the district court's legal conclusions de novo.

A.

We first consider Terry's claim that the district court erred by finding him liable to CresCom under the guaranty agreements he signed in connection with Notes 2622, 2718, 2911, and 3572. Terry maintains that under the parties' June 2009 Commitment Letter, Addendum, and Loan Amendment, CresCom was required to provide him, as guarantor, with ten days' written notice and an opportunity to cure before declaring any of the loans in default. Citing Georgia law for the proposition that breach of a contractual notice of default provision discharges a party's contractual obligations, he argues that he is not liable

10

to CresCom because CresCom failed to give proper notice. We disagree.

Under Georgia law,[4] the enforcement of unambiguous terms in a guaranty agreement presents an issue appropriate for summary judgment. Cong. Fin. Corp. v. Commercial Tech., Inc., 910 F. Supp. 637, 641 (N.D. Ga. 1995). Georgia courts have readily enforced unambiguous guaranty agreements, noting that competent parties may "choose, insert, and agree to whatever provisions they desire in a contract," provided they do not contravene the law or public policy. Core LaVista, LLC v. Cumming, 709 S.E.2d 336, 341 (Ga. Ct. App. 2011) (quoting Brookside Cmtys., LLC v. Lake Dow N. Corp., 603 S.E.2d 31, 33 (Ga. Ct. App. 2004)). Georgia law thus recognizes the enforceability of blanket waivers of defenses in guaranty agreements. See Branch Banking & Trust Co. v. Envtl. Tech., Inc., No. 5:12-CV-115, 2013 WL 4505884, at *9 (M.D. Ga. Aug. 22, 2013). Although Georgia courts have held that notice of default provisions in contracts must be strictly followed, In re Colony Square Co., 843 F.2d

---

[4] As explained infra in Part II.C., we agree with the district court's conclusion that Georgia law applies to the guaranty agreements between Terry and CresCom because we construe their ambiguous choice of law provisions against the drafter, CresCom. However, because most of the other agreements between CresCom and CCT (including the Commitment Letter and all of the loan agreements) contained explicit choice of law provisions selecting South Carolina law, South Carolina law governs all other documents referenced herein.

11

479, 481 (11th Cir. 1988), they have not held that failure to give proper notice discharges independent agreements with non-parties, including guarantors.

As the district court observed, the guaranty agreements in this case are absolute and relatively unambiguous. They provide that the signatory (Terry, in his personal capacity) "hereby absolutely and unconditionally guarantees to Lender the full and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of the debts, liabilities and obligations" of the notes guaranteed. J.A. 74 (emphasis added). They further state that the guarantor "acknowledges and agrees with Lender" that "[n]o act or thing need occur to establish the liability of the Undersigned hereunder, and no act or thing, except full payment and discharge of all indebtedness, shall in any way exonerate the Undersigned." J.A. 74. The guaranty agreements also specifically provide that the guarantor's liability will be unaffected by any failure to give notice, and the lender need not seek payment from the borrower before asserting its rights under the guaranty agreements. Finally, by signing the guaranty agreements, Terry waived "any and all defenses, claims and discharges of Borrower . . . except the defense of discharge by payment in full." J.A. 75.

The loan agreements themselves are similarly clear. In each agreement, CCT agrees that default will occur if it

12

"fail[s] to make a payment on time or in the amount due." J.A. 189. Under the loan agreements, the only trigger required for the loans to be in default is the failure to make a timely payment, at which time CresCom may demand immediate payment of the entire amount owed. The loan agreements contain no notice requirement and no requirement that a loan be formally declared in default after a missed payment.

Against this backdrop, Terry argues that he is nonetheless excused from his obligations under the guaranty agreements because CresCom was required to provide him, in his personal capacity, with ten days' written notice and an opportunity to cure any default before enforcing the agreements against him. For support, he points primarily to the notice provisions found in the parties' 2009 Commitment Letter and Loan Amendment, through which CresCom and CCT negotiated a cross-default and cross-collateralization provision concurrently with the extension of $750,000 of additional credit to CCT. To understand Terry's argument, a brief explanation of the terms of those documents is necessary.

The first page of the Commitment Letter defines the term "Borrower":

> Borrower: A to-be-named entity owned 100% by Edward L. Terry. The term "Borrower" as used herein shall be deemed to include any person named as an endorser, grantor or surety in connection with the proposed loan.

13

J.A. 265. The Letter also separately addresses Terry's role as guarantor, stating under the heading "Guaranty Agreement" that "Edward L. Terry (hereinafter referred to as 'Guarantors') shall guarantee payment of the Loan and other sums advanced for the Borrower's account under the loan documents." J.A. 266. The Commitment Letter later provides as follows, under the heading "Cross-Collateralization/Cross-default of Existing Loans":

> As part of the transaction contemplated herein, (i) Borrower, will cause [the existing Loans to] be amended to provide in the event of a payment default on any of those loans or a payment default on the [new] Loan, the Bank, at its option and ten (10) days written notice may declare all of the loans in default . . . .

J.A. 266. The Commitment Letter was signed by CresCom, CCT (through Terry as its representative), and Terry in his personal capacity under the heading "Guarantor."

After Note 3572 was finalized, CresCom and CCT memorialized their new agreement by signing the Loan Amendment. Terry was not a party to this agreement in his personal capacity, and the Loan Amendment makes no reference to him as guarantor. In its introductory paragraph, the Amendment identifies only two parties: (1) the Lender (CresCom Bank), and (2) the Borrowers (Terry's wholly owned companies). The Loan Amendment contains the following notice provision:

> [I]n the event of a payment default on either the Previous Loans or the New Loan . . . the Lender may declare some or all of the Previous Loans or the New Loan in default and require the immediate repayment of

14

> those loans . . . . In the event Lender determines to exercise its rights hereunder it shall give Borrowers no less than ten (10) days written notice from the date of the receipt of the notice to cure the default.

J.A. 311. The Loan Amendment states that all notices to the Borrower should be directed to Edward Terry at his business address in Marietta, Georgia.

Terry contends that despite the unambiguous terms of the guaranty agreements, CresCom was required under the Commitment Letter and Loan Amendment to provide him, in his personal capacity as guarantor, with notice and an opportunity to cure before enforcing the guaranty agreements against him. He stresses that the notice provisions in the Commitment Letter and Loan Amendment were drafted "such that CresCom is required to address and deliver the notice of default <u>to Terry individually</u>." Appellant's Br. at 20. Because no notice of default was provided to Terry, he argues that his obligations under the guaranty agreements have been discharged.

Terry's argument is unavailing for two independent reasons. First, the notice of default provisions in the Commitment Letter and Loan Amendment refer <u>only</u> to CresCom's exercise of its rights under the newly negotiated cross-collateralization and cross-default provisions. Both provisions state that "in the event of payment default" on any loan, CresCom may declare any other loan in default with ten days' written notice. The notice

15

provisions themselves thus presuppose that a "payment default" occurs automatically, before any notice requirement kicks in. This interpretation is consistent with the loan agreements, which make clear that default occurs immediately upon non-payment. The Loan Amendment's notice provision further clarifies that it refers to CresCom's option to "exercise its rights hereunder," referring to the new cross-default provision.

On June 18, 2011, each of the loans matured independently. Because full payment was not made, all of CCT's loans were immediately, automatically in default under the clear terms of the loan agreements. Thus, we find that no resort to cross-default was necessary because all of the loans were independently in default. Because CresCom had no obligation to provide notice in the event of an ordinary payment default, the district court correctly found that Terry was owed no notice.

Terry's argument also fails because, even if the notice provisions did require CresCom to provide CCT with ten days' notice of an ordinary default, neither the Commitment Letter nor the Loan Amendment provides for notice to Terry in his personal capacity as guarantor. As an initial matter, Terry is not a party to the Loan Amendment. See J.A. 310-14. Therefore, his claim relies on language in the parties' Commitment Letter. Specifically, Terry focuses on the definition of "Borrower" in the Commitment Letter, which states that the Borrower is a "to-

be-named entity owned 100% by Edward L. Terry." The provision goes on to say that "as used herein," the term "Borrower" includes "any person named as endorser, grantor or surety in connection with the proposed loan."[5] J.A. 265. Terry argues that this language, in combination with the notice requirement's reference to the "Borrower," indicates that CresCom was required to give him notice and an opportunity to cure before enforcing the guaranty agreements.

Even if the notice requirement applied to <u>all</u> defaults, the other terms of the Commitment Letter make clear that Terry was not a "Borrower" under that agreement and was not owed notice under this provision. Initially, paragraph 1 defines "Borrower" as an <u>entity</u> owned by Terry. In paragraph 11, the Commitment Letter separately provides for Terry personally as guarantor:

> 11. <u>Guaranty Agreement:</u> Edward L. Terry (hereinafter referred to as "Guarantors") shall guarantee payment of the Loan and other sums advanced for the Borrower's account under the loan documents, and performance of Borrower's obligations under the loan documents . . . .

J.A. 266. Finally, the last paragraph of the Letter provides that Terry is signing "on behalf of Borrower, Brentwood Homes . . . , Sugarloaf Marketplace, LLC, Whipple Development

---

[5] Under South Carolina law, which governs the Commitment Letter, there is no distinction between a surety and a guarantor. <u>See</u> <u>Carolina Hous. & Mortg. Corp. v. Orange Hill A. M. E. Church</u>, 97 S.E.2d 28, 31 (S.C. 1957).

17

Corporation and Harris Street, LLC." J.A. 270. On a lower line, he signs separately as "Edward L. Terry, Individually" under the heading "Guarantor."

Examining each of these provisions and the Commitment Letter as a whole, the term "Borrower" simply cannot be read to include Terry in his personal capacity without inviting an absurd result. By way of example, in the above-quoted "Guaranty Agreement" passage, it would mean that the guarantor and the borrower are one and the same. Additionally, paragraph 3 of the agreement refers to "the Bank's loans to the Borrower," but there are no loans in this case to Terry personally. Still other sections would be redundant if the "Borrower" was Terry personally, for example, paragraph 25, requiring "Borrower and guarantor[]" to provide annual financial statements. J.A. 268.

Moreover, as the district court observed, CresCom's claim against Terry is not based on CCT's breach of the promissory notes or Commitment Letter or any other agreement between those parties; it is based on Terry's breach of the guaranty agreements. Under the unambiguous and absolute terms of those agreements, notice is not a prerequisite to liability. See J.A. 81 ("No act or thing need occur to establish the liability of the Undersigned hereunder . . . ."); J.A. 82 ("The Undersigned waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing

18

Indebtedness."). Therefore, even if CresCom failed to give proper notice of default to CCT, Terry's obligation to guarantee the loans would be unaffected. See J.A. 82 ("The Undersigned waives any and all defenses, claims and discharges of Borrower . . . except the defense of discharge by payment in full."). Because Terry's guaranty obligations arose automatically upon CCT's failure to pay, we find that they have not been discharged.

B.

Having found that the district court correctly concluded that Terry is liable under the guaranty agreements, we turn to Terry's claim that the district court's computation of damages was erroneous. Specifically, he assigns error to three different aspects of the district court's award. First, he argues that the district court erred by failing to cap CresCom's damages at $1,121,029, the value the bankruptcy court assigned to CresCom's remaining unsecured claim at the conclusion of CCT's Chapter 11 proceedings. Second, he argues that the bankruptcy court's valuation of the properties conveyed to CresCom in CCT's bankruptcy was improperly low, and that the district court erroneously adopted that figure. Third, Terry argues that the district court erred by awarding CresCom a "late

19

fee" on the entire unpaid balance of the notes.  We address Terry's arguments in turn.[6]

1.

Terry first contends that the district court was obligated to cap damages at $1,121,029, which reflects the bankruptcy court's assessment of the value of CresCom's claim against CCT after subtracting the value of the properties deeded to CresCom. Terry stresses that because "[a] guarantor's liability is commensurate with the outstanding indebtedness of the principal debtor," Appellant's Br. at 29, he cannot be responsible for more than the amount that CCT owed CresCom in its bankruptcy. This argument, however, misapprehends CCT's actual indebtedness to CresCom and misapplies settled bankruptcy law.

Under the guaranty agreements, Terry is obligated to pay CCT's entire outstanding debt to CresCom, including interest and fees, "even though any other person obligated to pay Indebtedness, including Borrower, has such obligation discharged

---

[6] Terry also contends that the district court erred by applying the parties' contractual default interest rate to all interest accruing after the loans reached maturity despite CresCom's failure to formally declare them in default.  As explained above, we find that default occurred automatically upon nonpayment under the terms of the loan agreements. Therefore, no formal declaration of default was necessary (either to CCT or to Terry personally) for the default interest rate to apply, and default interest is appropriately part of the Indebtedness guaranteed by Terry.

in bankruptcy." J.A. 82 ¶¶ 7, 8. This result is consistent with 11 U.S.C. § 524(e), under which the discharge of a debt in bankruptcy "does not affect the liability of any other entity on, or the property of any other entity for, such debt." As the district court explained in its order, creditors are not barred by res judicata or any other doctrine from seeking the full amount of remaining debt against a guarantor unless the bankruptcy court has made a specific finding releasing claims against third parties. No such finding was made in this case.

Terry nonetheless argues that even if the discharge of CCT's debt in bankruptcy does not relieve him of his guaranty obligations, those obligations are limited to the $1,121,029 value of CresCom's deficiency claim. He stresses that § 524(e) does not preclude the bankruptcy court from releasing a non-debtor as part of a debtor's bankruptcy plan, nor does it prevent a finding that a debt has been wholly or partially satisfied because of a debtor's bankruptcy plan. However, Terry also acknowledges that the bankruptcy court "credited [the value of the transferred properties] against CresCom's claim in partial satisfaction of the debt," Appellant's Br. at 28, and does not contend (nor could he) that the value of those properties was not subtracted from the amount he now owes CresCom.

21

The critical fact overlooked by Terry is that the amount CresCom could seek in CCT's bankruptcy proceedings was less than the full amount it was owed. As Terry notes in his brief, CresCom's claim in CCT's bankruptcy "was allowed in the amount of $3,747,314 plus costs and attorneys' fees through the Petition Date." Appellant's Br. at 27 (emphasis added and internal quotation marks omitted). But that figure represented only the principal of the loans in question; CresCom's claim in the bankruptcy court did not include any interest or fees. At the time the properties were conveyed to CresCom in June 2013, the actual amount of CCT's debt to CresCom, including interest and fees, was $4,663,294.70. Therefore, although CresCom's outstanding unsecured claim at the conclusion of CCT's bankruptcy was only $1,121,029, CCT actually owed CresCom $2,112,294.70, the total indebtedness less the value of the conveyed properties.

Contrary to Terry's suggestion that CresCom will enjoy a windfall if it is allowed to recover more than $1,121,029 under the guaranty agreements, it is clear from the record that CCT's actual indebtedness to CresCom exceeded $2 million after the value of the conveyed properties was applied. Under the clear language of § 524(e) and the terms of the guaranty agreements, Terry remains liable for CCT's entire indebtedness regardless of the discharge of any of CCT's obligations in bankruptcy. We

22

therefore reject Terry's contention that the district court erred by awarding more than $1,121,029 to CresCom.[7]

## 2.

Terry next argues that the district court's award was excessive because it improperly adopted the bankruptcy court's valuations of the properties transferred to CresCom. He points out that the loan documents CresCom submitted to the district court for calculation of damages included appraised values of the properties from 2009 that totaled well over $4 million, significantly more than the $2,551,000 value determined by the bankruptcy court. If the district court had adopted those figures, Terry argues, the debt would have been fully satisfied upon transfer of the properties. Although the value assigned to the properties by the bankruptcy court was undoubtedly more favorable to CresCom than its internal valuations, we find no error in the district court's use of this figure because Terry

---

[7] We observe that the bankruptcy court and the district court differed in their estimations of the outstanding principal balance because the bankruptcy court did not take into account that a small portion of the principal (approximately $75,000) was paid off prior to the default. Thus, the bankruptcy court appears to have allowed CresCom to claim slightly more than the outstanding principal it was owed. However, because the district court had a more complete record before it and correctly stated the outstanding principal in its damages order, this inconsistency did not affect CresCom's final award or lead to a double recovery.

23

provided no alternative evidence of the properties' value at the time of their conveyance in 2013.

The bankruptcy court arrived at its valuations in March 2013 after a two-day hearing during which it heard testimony from three different appraisers (two offered by CresCom and one offered by CCT). Although Terry's wholly owned entity was a party to those proceedings, we agree with Terry that because he was not a party in his personal capacity, the valuations are not directly binding on him in this case. Understanding that the bankruptcy court's findings were not binding, CresCom proposed to stipulate to the findings for purposes of the district court's calculation of damages. Although Terry stresses that CresCom "offered no evidence in the district court to establish the values of the properties" other than proffering the bankruptcy court's orders, Appellant's Br. at 25, CresCom was not required to present additional evidence to propose a stipulation.

Notably, the only evidence Terry presented to contradict the bankruptcy court's valuations were CresCom's 2009 appraisals. Terry submitted no affidavits or other evidence to the district court to support his assertion that the figure reached by the bankruptcy court was inaccurate. His reliance on outdated, one-line notations in CresCom's loan documents does not create a genuine issue of fact because it does not bear on

24

the only valuation relevant in these proceedings: the value of the properties in 2013.

As the district court explained in its order on damages, "[t]here is no evidence in the record to support a finding that the old appraised value noted in the payment records reflects the value of the properties at the time of conveyance," particularly in light of the bankruptcy court's thorough examination of the evidence and consideration of testimony from both sides. CresCom Bank v. Terry, No. 2:12-cv-00063-PMD, Dkt. No. 73, at 5 n.5 (D. S.C. Nov. 25, 2013). Because the bankruptcy proceedings contained the only evidence before the district court regarding the 2013 value of the properties, the district court did not err by adopting the bankruptcy court's findings and concluding that Terry had not created a genuine issue of material fact.

3.

Finally, Terry objects to the award of contractual "late fees" of five percent on the entire principal due at the time of the default. He argues that the terms of the loan agreements make clear that the parties intended late fees to apply only to missed monthly interest payments and not to the entire principal, and further, that a late fee on the entire principal constitutes an unenforceable penalty. CresCom devotes only three sentences of its brief to this issue, simply stating that

late fees are an "accepted business practice" that do not violate the lending laws or public policy of South Carolina or Georgia.[8] Appellee's Br. at 28. While we agree with CresCom that late fees are a permissible and unremarkable element of the parties' agreement when applied to <u>monthly interest payments</u>, it is evident from the loan documents and Commitment Letter that the parties did not intend the five percent late fee to apply to the entire outstanding principal.

The late fees agreed upon by the parties are described in three different documents: the loan agreements, the Commitment Letter, and the loan modification agreements executed after the Commitment Letter and final loan were finalized. The loan agreements provide that "[i]f a payment is not made within 10 days days [sic] after it is due, [Borrower] agree[s] to pay a late charge of 5.00% of the late payment." <u>See, e.g.</u>, J.A. 26.[9] Under a separate heading labeled "Payments," the loan agreements describe both "Interest" and "Principal," establishing monthly interest payments due on the first of each month and a single

---

[8] While the parties cite cases from a number of jurisdictions, we reiterate that South Carolina law governs the loan agreements in which the late fee provisions are found. <u>See</u> <u>supra</u> note 4.

[9] Later loan renewals altered this language slightly to provide that the late charge would be "5.00% of the late payment <u>or $25.00 whichever is greater</u>." <u>See, e.g.</u>, J.A. 29 (emphasis added).

date on which the principal would be due.  In June 2009 when the parties signed the Commitment Letter, they addressed the issue of late fees more specifically:

> Late Charge: The note shall impose a late charge of five (5%) percent of the current monthly interest installments if the payment is not received within ten (10) days of its due date.

J.A. 266 (emphasis added).  Although Note 3572 (closed six days after the Commitment Letter was signed) used the same standard late charge provision as the other loan agreements, the parties agreed that the terms of the Commitment Letter would survive the closing of the new loan and the modifications to the existing loans.  The subsequent modifications essentially incorporated the standard language in the earlier loan agreements, specifying that if a payment is ten days late or more, the Borrower "will be charged 5.00% of the unpaid portion of the payment amount or $25.00, whichever is greater."  J.A. 46.

Given the binding nature of the Commitment Letter, we cannot agree with the district court that a late charge on the entire principal is supported by the loan documents because Note 3572 "broadened the late charge language to cover all payments." J.A. 742.  Rather, we find that to the extent the late charge provision in the loan agreements might previously have been ambiguous in scope, that confusion was eliminated by the clear language of the Commitment Letter, the terms of which explicitly

27

survived Note 3572 and the modifications to the existing loans. See J.A. 269 (providing that the Letter "shall survive the loan closing and become binding together with all other loan documents"). Moreover, although the terms of the Commitment Letter only directly applied to Note 3572, the language used in Note 3572 regarding late charges was identical to the language used in the other notes. Because there is no indication that the parties intended identical late charge provisions in the four notes to be interpreted differently, we read the language of the Commitment Letter as an indication that the parties intended to limit the five percent late charge to outstanding monthly interest under all of the notes. Accordingly, the assessment of a late charge on the multi-million dollar outstanding principal is impermissible.[10] We therefore vacate

---

[10] Terry cites a body of non-precedential case law to support his argument that even if the parties did intend the late fee to apply more broadly, a five percent late fee on the entire principal amounts to an unenforceable penalty. See Appellant's Br. at 47–51. However, neither his brief nor the district court's opinion cites any relevant cases decided under South Carolina law. Although it appears that at least one court in our circuit has refused to award a five percent late charge on the entire principal due upon a loan's maturity, see Mountain 1st Bank & Trust v. Holtzman, No. 7:11-cv-01433, 2012 WL 3126833, at *3 (D.S.C. July 31, 2012) (providing no reasoning but "declin[ing] to grant Plaintiff" over $10,000 in late charges after the defendant failed to pay the principal of $200,000 when due), we need not decide whether the late charge was an unenforceable penalty under South Carolina law because we find that the parties' contracts only provide for late charges on monthly interest payments.

28

the district court's award of a five percent late fee on the full outstanding principal. Because the outstanding principal to which the improper fee was applied totaled $3,672,029.78, we direct the district court to reduce CresCom's award by five percent of that amount, or $183,601.49.

## C.

We now turn to CresCom's sole basis for appeal--that the district court improperly refused to award attorney's fees because it found that Georgia law applies to the guaranty agreements and bars recovery of those fees for lack of notice. CresCom alternatively contends that even if Georgia law does apply, the district court still erred by refusing to reimburse CresCom for the attorney's fees it incurred as a result of CCT's bankruptcy. Although we agree with the district court that the guaranty agreements are governed by Georgia law, we also agree with CresCom that the attorney's fees it incurred in CCT's bankruptcy are a part of the underlying "Indebtedness" and their recovery is therefore not barred by Georgia law.

The parties agree that the loan agreements, promissory notes, mortgages, and Commitment Letter contain unambiguous choice of law clauses selecting South Carolina law. However, the choice of law provision in the guaranty agreements is less clear:

29

> This guaranty shall be effective upon delivery to Lender, without further act, condition or acceptance by Lender, shall be binding upon the Undersigned . . . and shall inure to the benefit of Lender and its participants, successors and assigns. . . . <u>This guaranty shall be governed by the laws of the State in which it is executed.</u> The Undersigned waives notice of Lender's acceptance hereof.

J.A. 75 (emphasis added). Terry argues that Georgia law governs the guaranty agreements because the agreements were "executed" when he signed them at his office in Georgia. CresCom disagrees, maintaining that the agreements were "executed" when they became effective (i.e., upon delivery to its office in South Carolina), and moreover that the parties' course of dealing demonstrates that the entire transaction (including Terry's personal guaranty) was intended to be governed by South Carolina law.

As the district court observed, the term "executed" is problematic here. Black's Law Dictionary defines "execute" to mean <u>either</u> (1) "[t]o make (a legal document) valid by signing," or (2) "to bring (a legal document) into its final, legally enforceable form." <u>Black's Law Dictionary</u> 609 (10th ed. 2014). It further defines "executed" to mean a document "that has been signed." <u>Id.</u> It is thus unclear whether the state "in which [the guaranty] is executed" is the state in which it was signed by Terry (Georgia) or the state in which it became legally enforceable (South Carolina). A clear contractual term

30

susceptible to more than one reasonable interpretation constitutes a patent ambiguity appropriate for resolution by the court. Am. Trucking Ass'n, Inc. v. Fed. Highway Admin., 51 F.3d 405, 412 & n.9 (4th Cir. 1995); Ward v. Dixie Nat'l Life Ins. Co., 257 F. App'x 620, 627 (4th Cir. 2007) (unpublished).

Under basic principles of either South Carolina or Georgia contract law, we construe the ambiguity in the parties' agreement strictly against the drafter, CresCom. Duncan v. Little, 682 S.E.2d 788, 791 (S.C. 2009); J & E Builders, Inc. v. R C Dev., Inc., 646 S.E.2d 299, 301 (Ga. Ct. App. 2007). Although CresCom argues strenuously that the parties' course of dealing demonstrates that South Carolina was the "home base" for all transactions, the guaranty agreements are legally distinct instruments, made with a private citizen of Florida from his office in Georgia. Notably absent in the guaranty agreements are the clear South Carolina choice of law clauses found in each of the parties' other documents. Therefore, because Terry signed the guaranty agreements in Georgia and reasonably believed that they were consequently covered by Georgia law, we find that Georgia law applies.

Under Georgia law, a party may not seek attorney's fees unless it complies with the requirements of Ga. Code Ann. § 13-1-11(a)(3), which provides that obligations to pay attorney's

fees are valid and enforceable subject to the following
condition:

> [T]he holder of the note or other evidence of
> indebtedness . . . shall, after maturity of the
> obligation, notify in writing the maker, endorser, or
> party sought to be held on said obligation that the
> provisions relative to payment of attorney's fees in
> addition to the principal and interest shall be
> enforced and that such [party] has ten days from the
> receipt of such notice to pay the principal and
> interest without the attorney's fees.

CresCom concedes, and we agree, that under Georgia law it would
not be entitled to attorney's fees incurred in this litigation
because it did not provide Terry proper notice. But CresCom
argues that Georgia law does not bar it from recovering the
attorney's fees it incurred participating in CCT's bankruptcy,
because those fees are a part of the underlying indebtedness and
are not covered by Georgia law. We find that CresCom's argument
is supported by the loan and guaranty agreements, and that the
district court erred by refusing to award CresCom this portion
of its attorney's fees.

Although CresCom's enforcement of the guaranty agreements
against Terry is governed by Georgia law, CCT's obligations to
CresCom (and thus, the total "indebtedness" CresCom can seek
from Terry) are governed by South Carolina law by virtue of the
unambiguous choice of law clauses in the loan agreements.
Unlike Georgia, South Carolina does not have a provision
requiring CresCom to give notice of its intent to collect

32

attorney's fees.   The loan agreements between CCT and CresCom make clear that CCT is liable for reasonable attorney's fees and costs incurred as part of CresCom's collection of the debt, including in bankruptcy proceedings.   J.A. 250.   The guaranty agreements also define the "Indebtedness" of the borrower for which the guarantor is responsible to include "post-bankruptcy petition interest and attorneys' fees," even if those fees are discharged in bankruptcy.   J.A. 77.

Because the loan agreements made CCT liable for CresCom's attorney's fees upon default, the expenses that CresCom incurred due to its participation in CCT's bankruptcy (before any efforts to enforce the guaranty agreements and before Terry personally became a party) were not governed by the guaranty agreements or by Georgia law.   Rather, CresCom's attorney's fees from those proceedings became a part of the underlying indebtedness owed to it by CCT under the loan agreements, which are governed by South Carolina law and do not require notice.   Because the fees are a part of CCT's indebtedness, they are guaranteed absolutely by Terry.   We therefore partially reverse the district court's grant of summary judgment to Terry and remand with instructions

33

to award CresCom attorney's fees stemming from its participation in CCT's bankruptcy.[11]

III.

For the reasons given, we affirm the district court's grant of summary judgment to CresCom with respect to Terry's liability under the guaranty agreements.  We vacate the district court's award of a five percent late fee to CresCom on the outstanding principal of the loans, reverse its refusal to award CresCom the attorney's fees it incurred in CCT's bankruptcy proceedings, and remand for recalculation of attorney's fees.

AFFIRMED IN PART, VACATED IN PART,
REVERSED IN PART, AND REMANDED

---

[11]  The "Affidavit of Indebtedness" and "Affidavit of Attorney's Fees" submitted by CresCom describe $51,156.00 in attorney's fees related to CCT's bankruptcy, but also reference unallocated fees of over $22,000 paid to the Falcone Law Firm and the Annino Law Firm.  J.A. 589–93.  Because it is unclear from the record whether those fees were expended in the instant action or in CCT's bankruptcy proceedings, we remand for the district court to recalculate CresCom's attorney's fees.